**In re Domenic SPIRITO and Regina Spirito, Debtors.**

**Domenic SPIRITO and Regina Spirito, Plaintiffs,**

**v.**

**UNITED STATES of America, Defendant.**

Bankruptcy No. 95–01861–6B7.
Adv. No. 95–179.

United States Bankruptcy Court,
M.D. Florida,
Orlando Division.

May 10, 1996.

Kevin E. Mangum, Orlando, Florida, for Domenic Spirito and Regina Spirito.

Brian L. Schwalb, U.S. Department of Justice, Washington, D.C., for the United States of America.

### MEMORANDUM OPINION

ARTHUR B. BRISKMAN, Bankruptcy Judge.

This matter came before the Court on the Complaint to Determine Dischargeability of Debt pursuant to 11 U.S.C. § 523. Appearing before the Court were Kevin E. Mangum, counsel for Plaintiffs, Domenic Spirito and Regina Spirito; and Brian L. Schwalb, counsel for the Defendant, United States of America. After reviewing the pleadings, evi-

dence, receiving testimony, exhibits, arguments of counsel, and authorities for their respective positions, the Court makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

On April 18, 1995, Domenic Spirito and Regina Spirito ("Spiritos") filed for relief under Chapter 7 of the Bankruptcy Code. On May 18, 1995, counsel for the Spiritos wrote to the Internal Revenue Service ("IRS"), Special Procedures Function, seeking to receive an "official letter" from the IRS stating whether or not the IRS deemed the debtors' tax liabilities for the tax years 1986, 1988, 1989, 1990 and 1991 to be dischargeable. On June 13, 1995, the Spiritos' counsel received a letter from the IRS stating the IRS showed no tax liability due and owing from the debtors for the year 1986, and that the tax liabilities for 1988, 1989, 1990 and 1991 were dischargeable in bankruptcy. (Pls.' Ex. 1). However, the "official letter" was conditional; therefore, the Spiritos initiated this adversary proceeding.

On July 31, 1995, the IRS filed an answer to the complaint admitting the tax years in question were "stale taxes." The Spiritos filed a Motion for Judgment on the Pleadings on August 17, 1995. The Court passed over ruling on the Motion for Judgment on the Pleadings until trial. At trial, the Spiritos renewed the motion. The Court denied the motion. The parties stipulated there was no tax liability outstanding for tax years 1986 and 1988. The parties further stipulated the IRS had the burden of going forward at trial and proving, by a preponderance of the evidence, that the "stale taxes" should be excepted from discharge.

Domenic Spirito and Regina Spirito are husband and wife and have always filed joint federal income tax returns. The Spiritos filed income tax returns timely, including the tax year of 1987. For tax years 1989 and 1990 the Spiritos filed extensions but failed to file their tax returns until September of 1991. The Spiritos timely filed their 1991 tax return and filed their 1992 and 1993 tax returns on March 15, 1994; they filed their 1994 tax return on March 1, 1995. The Spiritos did not file fraudulent returns for any of the tax years in question.

During 1989, 1990 and 1991, the Spiritos failed to make quarterly estimated tax payments. The Spiritos earned income during the years 1989, 1990 and 1991 and accumulated a tax liability of over $68,000.00 for these years. Although the Spiritos had made estimated tax payments in previous years[1], the Spiritos made only one estimated tax payment of $1,000.00 during 1989 and no estimated tax payments during 1990 or 1991.

During trial, the Spiritos acknowledged that they filed their returns for 1989 and 1990 in September 1991 only after the IRS prodded them to do so.[2] Although they acknowledged on their 1989 joint income tax return that they owed $28,721 in income tax, plus an undetermined amount of penalty based on their underpayment of estimated taxes, the Spiritos submitted only $10,000.00 with their return. Their 1990 joint income tax return indicated that they owed $20,652.00 in income tax, plus an undetermined amount of penalty based on their underpayment of estimated taxes, the Spiritos submitted only $2,000.00 with their return.[3]

At the time they received their income, the Spiritos knew that no federal income taxes

---

1. The Spiritos made several quarterly estimated tax payments during 1988, they nevertheless incurred a substantial tax deficiency for that year. The Spiritos provided no explanation as to why, in the face of their 1988 tax deficiency, they decreased the amount of their estimated tax payments for 1989, 1990 and 1991.

2. The IRS contends that the Spiritos did not seek an extension of time in which to file their 1989 or 1990 returns. The Court notes that the IRS was unable to locate the Spirito file and therefore could not produce evidence that no extension was filed.

3. The Spiritos timely filed a joint return for 1991 acknowledging a tax obligation of $21,363.00; however, they submitted no payment with the return. Despite being asked by both the Court and Government counsel, neither Domenic Spirito nor Regina Spirito could explain why they filed a timely return for 1991, without submitting any payment, when their justification for not filing timely returns for 1989 and 1990 had been their alleged inability to pay.

were being withheld and that they had a legal obligation to make estimated tax payments. The Spiritos knew they had a legal duty to file annual income tax returns and knew that those returns were due by April 15 of the following year. The Spiritos deliberately chose not to file the 1989 and 1990 returns when due because they did not have sufficient money to pay their acknowledged tax debts.

In June 1991, the IRS sent the Spiritos a written request to file their delinquent returns. Between October 1991 and June 1992, the IRS repeatedly sent the Spiritos notices of their outstanding federal income tax liabilities.[4] In January of 1992, the Spiritos retained Certified Public Accountant, John E. Russi, to negotiate a payment plan with the IRS; no structured payment plan was reached.

The IRS referred the collection case to the local Orlando field office where it was assigned to Revenue Officer Joe Curtis in May 1992. In early June 1992, Curtis visited the Spiritos' home to discuss how and when they intended to pay their outstanding taxes. Curtis advised Domenic Spirito that he and his wife owed federal income taxes for 1989, 1990 and 1991, but Domenic Spirito refused to discuss the tax liabilities or his intentions concerning payment. Consequently, Domenic Spirito received a notice to appear at IRS offices with certain documents. Prior to attending the meeting at IRS offices, Domenic Spirito was introduced to a man named J.J. Conway. At that period in time Domenic Spirito was working as a time-share salesman for the company of a friend, Neil Sidlow.

J.J. Conway gave Domenic Spirito advice on how to handle the upcoming meeting with the IRS, and Domenic Spirito heeded J.J. Conway's advice during the meeting with Curtis. J.J. Conway was involved in, and soliciting memberships for an organization known as "The Pilot Connection." The Pilot Connection was an "un-taxing" organization which provided its members, in exchange for a membership fee, with packages of information outlining how to become "un-taxed" and removed from the federal government's taxing system. J.J. Conway introduced the Spiritos to the Pilot Connection. Domenic Spirito voluntarily joined The Pilot Connection because the Spiritos wanted to be "released" from the assessed federal income tax liabilities that the IRS was actively seeking to collect.[5]

In August of 1992, the Spiritos mailed a letter to the IRS stating that the IRS's attempts to collect the tax debts were unenforceable and that they believed the payment of tax to be voluntary. (Def.'s Ex. 13). This letter was written in response to IRS correspondence requesting that they voluntarily pay their taxes. The Spiritos knowingly signed this letter although they contend that they did not understand much of what the letter contained. The Spiritos knew that at least some of the representations in their letter, particularly their contention that they were non-resident aliens, were knowingly false.

On September 2, 1992, the Spiritos received a response from IRS stating that the IRS wished to secure the highest possible performance of voluntary payments. (Pls.' Ex. 3). Domenic Spirito testified he had been led to believe by J.J. Conway that he would receive a "full release" on the tax liabilities by sending such a letter. As part of The Pilot Connection concept, the Spiritos established a nominee bank account in the name of Sterling Consultants, Inc. in September 1992 and transferred funds from their one and only personal bank account into

---

4. With respect to the 1989 income tax liability, the IRS sent the Spiritos four (4) notices and requests for payment—on December 2, 1991, January 20, 1992, February 24, 1992 and March 30, 1992—before issuing a final Notice of Intent to Levy on April 13, 1992. With respect to the 1990 income tax liability, the IRS sent the Spiritos four (4) notices and requests for payment—on October 14, 1991, November 18, 1991, December 23, 1991 and January 27, 1992—before issuing a final Notice of Intent to Levy on March 2, 1992. With respect to the 1991 income tax liability, the

IRS requested payment on June 1, 1992, and issued a Notice of Intent to Levy on June 22, 1992.

5. The Spiritos testified that Domenic Spirito joined The Pilot Connection with the belief that, if what they were doing was wrong, the IRS would so alert them, at which point, according to the Spiritos, they would voluntarily comply with the law.

the new account. The Spiritos made deposits into and wrote checks from this account, which was used to pay normal, everyday living expenses. The Sterling Consultants account was used as the Spiritos sole account until they moved from Orlando in July 1993. The Spiritos set up the nominee account for purposes of removing themselves from the federal tax system. In addition, Regina Spirito requested that her employer stop withholding taxes from her salary.

Domenic Spirito participated in The Pilot Connection, introducing J.J. Conway to other timeshare salesmen, facilitating informational meetings at the Steeplecrest site, allowing J.J. Conway to use the Steeplecrest computer to generate materials, and attending The Pilot Connection's seminars promoting the "untaxing" product.

Regina Spirito was reluctant to become involved with the Pilot Connection, to send the correspondence to the IRS, and to set up the nominee account. Ultimately, the decisions regarding the organization, the correspondence, and the nominee account were made and Regina Spirito concurred with her husband's decision to join The Pilot Connection to facilitate the Spiritos' removal from the federal tax system. Regina Spirito was a knowing participant in the effort to evade paying their tax liability.

The Spiritos knowingly sent false and frivolous correspondence to the IRS asserting that they did not have a duty to pay their tax liability for the years 1989, 1990 and 1991. The Spiritos read, signed and sent the correspondence to the IRS because they thought it would assist in their removal from the federal tax system. Their deliberate decision to send knowingly untruthful correspondence to the IRS as part of a calculated effort to remove themselves from the federal income tax system constitutes an affirmative act to evade or defeat their taxes.

In furtherance of its collection efforts, the IRS prepared and filed a Notice of Federal Tax Lien Under Internal Revenue Laws in the public records of Orange County, Florida, in the Summer of 1992, reflecting the Spiritos' income tax liabilities. Curtis also served levies on the Spiritos' employers and bank accounts. The Spiritos acknowledged

receiving written notice of these collection measures. Because Curtis had no information at the time suggesting that the Spiritos had established a nominee bank account, Curtis was not able to serve a levy on the Sterling Consultants account. On September 24, 1992, the IRS collected just $42.51 pursuant to one of the levies.

Once Curtis learned of the nominee account, the IRS issued a nominee levy against the Spiritos' checking account in the name of Sterling Consultants, Inc. on June 15, 1993. The IRS collected $1,693.50 pursuant to the levy on July 12, 1993 and applied said funds to the tax liabilities. (Pls.' Ex. 6). No other monies were collected.

During the time subsequent to establishing the account, the IRS had knowledge of where the Spiritos lived, their places of employment and their banking activities, as evidenced by the IRS seizing the Spiritos' SunTrust bank account on September 1, 1992. (Pls.' Ex. 4). Prior to and after the seizure of this account, the Spiritos did not receive any contact from the IRS until June 1993.

In April 1993 Domenic Spirito was contacted by a previous employer in regard to a time-share project beginning in Canada. The Spiritos decided to move to Canada for employment. The move occurred sometime in June of 1993.

Prior to the move, Domenic Spirito contacted Curtis to inform him of the move and affirmatively disavowed any further connection with "The Pilot Connection." Domenic Spirito knew he needed to resolve the tax liabilities outstanding. From the day the Spiritos moved, they remained in compliance with estimating taxes and filing returns.

Either immediately before or shortly after the move, Domenic Spirito told Curtis they were moving out of their Orlando house and would be renting the house to tenants. The Spiritos gave Curtis their temporary Cleveland, Ohio forwarding address and subsequently their Canadian residential address and telephone numbers.

After the Spiritos moved to Canada, the tenants in the Spiritos' former homestead communicated their desire to purchase the

home. In late September or early October of 1993 Domenic Spirito contacted Curtis and informed him of the potential buyer and inquired into how to resolve the issue of the tax liens encumbering the property. Curtis specifically explained to him the "closest IRS office" to Canada, Cleveland, Ohio, and the proper forms to be filled out and the procedure to be undertaken. Domenic Spirito sent all of the properly completed documents and relevant attachments to begin the process to release the liens to Curtis, via facsimile, from the Cleveland, Ohio IRS office. (Pls.' Exs. 7–9).

The next day, Domenic Spirito communicated with Curtis and was informed there were additional documents necessary. On that day, Domenic Spirito sent Curtis the documents requested via facsimile. On October 29, 1993, again under the direction of Curtis, Domenic Spirito sent additional documents to Curtis in an attempt to have the liens released so the sale could be consummated. After a lapse of approximately sixty (60) to ninety (90) days, and no response from IRS, the deal fell through. The first mortgagee eventually foreclosed the property.

On January 18, 1996, after moving back to Orlando, the Spiritos mailed a letter to the IRS expressly disavowing any affiliation with "The Pilot Connection." (Pls.' Ex. 10). Domenic Spirito also contacted Curtis upon moving back to Orlando in an effort to establish a repayment plan.

The IRS did not act on this case for a considerable amount of time. However, the Spiritos were aware that they were required to file their tax returns timely as evidenced by their 1987 and 1991 returns. Even though they eventually sought to rehabilitate themselves by working with the IRS in solving their tax liability issues, the Spiritos initially acted to evade or defeat their taxes.

## CONCLUSIONS OF LAW

The Bankruptcy Code provides, in pertinent part:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual from any debt—

(1) for a tax or a customs duty—

. . . .

(C) with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax. . . .

11 U.S.C. § 523(a)(1)(C). The question presented in this case is whether it is more likely than not that the Spiritos willfully attempted, in any manner, to evade or defeat the tax liabilities they seek to have declared discharged. *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991); *Binkley v. United States,* 176 B.R. 260 (Bankr.M.D.Fla.1994); *In re Kirk,* 98 B.R. 51 (Bankr.M.D.Fla.1989).

■ The failure to pay acknowledged tax liabilities, by itself, does not render those tax debts excepted from discharge. *In re Haas,* 48 F.3d 1153 (11th Cir.1995). The Eleventh Circuit compared the language of Section 523(a)(1)(C) to similar language found in four provisions of the Internal Revenue Code, including Section 7201, which use the phrase "in any manner to evade or defeat" taxes, but which also include the phrase "or the payment thereof." The failure to include the phrase "or the payment thereof" in Section 523(a)(1)(C) indicates that "Congress did not intend that a failure to pay taxes, *without more,* should result in the nondischargeability of a debtor's tax liabilities in bankruptcy." 48 F.3d at 1157 (emphasis added). Affirmative acts intended to evade or defeat the collection or payment of taxes are not irrelevant to the Section 523(a)(1)(C) exception to discharge.

"[T]he modifying phrase 'in any manner' is sufficiently broad to include willful attempts to evade taxes by concealing assets to protect them from execution or attachment as these debtors did." *In re Jones,* 116 B.R. 810, 814 (Bankr.D.Kan.1990). "If willful attempts to evade or defeat the collection of taxes do not satisfy § 523(a)(1)(C), then these debtors have discovered a most lucrative device, one which would allow them to defeat the collection of . . . taxes." *Id.*

■ From the time of their recognized duty to make estimated tax payments, the

Spiritos willfully attempted to evade or defeat their joint assessed federal income tax liabilities for 1989 through 1991, inclusive. The Spiritos failed to file timely returns for 1989 and 1990 despite their acknowledged duty to do so. The Spiritos' did not file returns because they did not have the money to pay their taxes. The Spiritos then failed to pay their income tax liabilities despite earning income. Although they knew that they had a duty to make periodic estimated tax payments, the Spiritos failed to contribute any of their earnings to the payment of their income tax debts, and decreased their estimated tax payments in the face of deficiencies for earlier years.[6] The Spiritos failed to satisfy their acknowledged tax liabilities when they filed their returns.

The decision that this Court must make is whether under the totality of the circumstances, the Spiritos' actions after June 1993 mitigate their prior conduct. Can the bell ever be unrung? The answer may be probably. The Spiritos did attempt to work with the government after June 1993. The government did not aggressively pursue the Spiritos and, in fact, could not locate the Spiritos' file. However, the Court is not persuaded that in the instant case the Spiritos subsequent efforts absolve them of their prior conduct. The Spiritos' subsequent corrective behavior is not sufficient in deed or time to permit this Court to declare their tax liability dischargeable.

The Spiritos did more than merely fail to pay taxes that they knew were due and owing. The Spiritos knowingly sent false and frivolous correspondence to the IRS contending that they did not have a duty to pay their 1989, 1990 and 1991 income tax liabilities. The Spiritos acknowledge that they read, signed and sent the correspondence because they believed it would facilitate their removal from the federal tax system. The Spiritos' conscious decision to send knowingly untruthful correspondence to the IRS as part of a deliberate effort to remove themselves from the federal income tax system

constitutes an affirmative act to evade or defeat their taxes.

In the face of the IRS collection efforts, the Spiritos consciously decided to close their personal bank account, which they had maintained in their own names, and to open a nominee account. *See Eyler v. Commissioner*, 760 F.2d 1129 (11th Cir.1985) (transfers made in the face of serious financial difficulties constitute badges of fraud and raise an inference of an intent to evade taxes); *In re Wright*, 191 B.R. 291 (S.D.N.Y.1995) (taxpayer closed out bank accounts to impede IRS attempts to locate assets). The Spiritos' deceptive act of converting their joint bank account to a nominee account effectively prevented the IRS from using its administrative levy power to seize those assets. The Spiritos' affirmative acts prevented assets and earnings from being subject to levy; such acts were egregious and constituted willful attempts to evade or defeat their 1989, 1990 and 1991 tax liabilities. *See Binkley*, 176 B.R. at 265; *In re Griffith*, 161 B.R. 727, 732–733 (Bankr.S.D.Fla.1993); *In re Lewis*, 151 B.R. 140, 146 (Bankr.W.D.Tenn.1992).

One of the primary purposes of the Bankruptcy Code is to give the "honest but unfortunate" debtor a fresh start. *Grogan*, 498 U.S. at 286–87, 111 S.Ct. at 659–60; *In re Haas*, 48 F.3d at 1156. Disallowing a discharge of tax debts owed by debtors who endeavored to evade taxes will not undermine the Bankruptcy Code's fresh start objective; however, it will promote an equally important objective expressed by Congress, namely that the Bankruptcy Code not become an inappropriate tax evasion device. In addition to their willful attempts to evade or defeat the collection of their taxes, Domenic Spirito was an active member of an organization that had, as its announced mission, removing its members from the federal income tax system. *See In re Semo*, 188 B.R. 359 (Bankr.W.D.Pa.1995) (denial of discharge under 11 U.S.C. § 523(a)(1)(C)); *In re Laurin*, 161 B.R. 73 (Bankr.D.Wyo.1993) (same); *Langlois v. United States*, 155 B.R. 818 (N.D.N.Y.1993) (same); *Boch v. United*

---

6. The Internal Revenue Code requires that the four quarterly estimated tax payments or "required annual payments," be the lesser of "90 percent of the tax shown on the return of the

taxable year ... or 100 percent of the tax shown on the return of the individual for the preceding taxable year." 26 U.S.C. § 6654(d)(1).

*States,* 154 B.R. 647 (Bankr.M.D.Pa.1993) (same); *Carlen v. Dept. of Treasury,* Nos. 90–60855, 90–6187, 1991 WL 424977 (Bankr. N.D.Ind.1991) (same); *In re Harrison,* 91–1 U.S.T.C. ¶ 50,078 (Bankr.N.D.Ind.1991) (same). The Spiritos, who placed an obstacle in the way of the IRS to collect their taxes, are not the "honest but unfortunate debtors" the Bankruptcy Code was designed to assist.

For the foregoing reasons, the Spiritos' assessed federal income tax liabilities for the years 1989 through 1991, inclusive, are excepted from discharge pursuant to 11 U.S.C. § 523(a)(1)(C).